Next we'll hear is Jones v. Chaudhary May it please the Court, Amir Ali of the MacArthur Justice Center, for the appellant Matthew Jones. Your Honors, our position in this appeal is a narrow one. That Defendant Trubig failed to satisfy his burden under the procedure that this Court has adopted to set aside a jury verdict based on qualified immunity. In Kerman, in Zellner, in Outlaw, the Court recognized that a jury's verdict as to excessive force necessarily turns on the jury's view as to what a reasonable officer would have perceived in the circumstances. Respect for the jury verdict and for the plaintiff's Seventh Amendment right precludes a court from substituting its view of what a reasonable officer would have perceived for the jury's view. And therefore, when a defendant seeks to set aside the verdict based on immunity, he has the burden to submit the necessary questions to the jury and to establish that the jury viewed the facts as he says it did. Where the defendant fails to submit the relevant questions to the jury, the court must view the fact in the best possible way for the plaintiff. So I want to focus the Court specifically on the second tasing in this case because we see that as the narrowest ground for reversal that prevents the Court from having to deal with any of the other two issues we raise, dealing with the first tasing and with the inconsistency with punitive damages. So let me begin with three premises because I think these will really help focus the Court and narrow the issue here. First, everybody appears to agree that it violates clearly established law to inflict gratuitous force against someone who's already been incapacitated. Second, Defendant Trubig has never contested that the jury could have concluded based on the evidence before it that Mr. Jones was incapacitated and that its verdict could be based on the fact that a reasonable officer in the circumstances would have known he was incapacitated. And third, Defendant Trubig does not even argue that his interrogatories established that Mr. Jones was not subdued at the time of the second tasing. That argue, I think they're going to argue that it's uncontroverted that he was uncuffed at the time of the second tase and that that means that he's not subdued. So why don't you respond to that argument? It's uncontroverted, right? Even though there wasn't an interrogatory, it's uncontroverted he was not cuffed at the time of the second tase. So, Your Honor, that's correct. A couple of responses. First of all, on the law, and second, the kind of perverse consequence of such an argument, and then third, I can talk about the specific facts here. But first on the law, the court in Soto considered the question of whether Tracy decided before the events in this case clearly established a violation where officers tased a man who had just been tased. And in that instance, not only was he not handcuffed, but the court viewed subdued in a much more kind of logical way than is the person handcuffed. In that case, in fact, the individual, it was uncontested, was starting to rise to his feet. In this case, it is — there was no evidence that at the time of the second tase, Mr. Jones was doing anything but laying flat on the floor, probably still writhing from the first tase, to borrow the language of the Eighth Circuit. When the district court noted that in its opinion, I think, several times, that was just incorrect. At the time of this, right before the second tase, after the first tase, he was rising. It's just — nobody says that. Exactly, Your Honor. So — and I think that shows how easy it is to resolve this case, frankly. I mean, if you look at the district court's opinion at JA 153 and 164, the district court says the parties agree that Mr. Jones was unsubdued. That's 153. And then later says the parties agree that he was rising at the time of the second tase. Everybody agrees that was wrong. If you look at Defendant Trubrig's brief, they now agree with us that that stipulation, that he was rising, was the first tase. That stipulation was at JA 148. And we say with respect to the initial taser cycle, he was rising. So everybody agrees. Nobody is with the district court here at this point. I just want to go back to Soto for a second. One of the things in the briefs is whether or not Soto would apply here. It was decided after the incident, but it was looking at what was the law as of 2010, I think, right? That's right, Your Honor. And this is a really important point. So, you know, if we were coming to this court and saying these officers should have read Soto and had notice based on Soto, obviously we'd be in trouble. But that's not what we're saying. We're saying, look, Soto looked at what Tracy decided before this case clearly established. And Soto looked at a case, you know, bringing Tracy. I think Tracy has many facts that are particularized to this case. But Soto then added two really important ones. One, the exact force here, a cartridge mode tasing, which subdued the plaintiff, and then a subsequent tasing, the exact force here. The second important thing it added was that this person was unsubdued. And, you know, the defendants in Soto made the exact same arguments here. They said, we just got there. You know, we didn't know what was happening. We didn't know if he was armed. And the court said, whoa, whoa, whoa, whoa, whoa, disputes of fact for the jury to resolve. And it would be – Let me ask you about that because I'm troubled by the lack of harmonization between the district court opinion and the jury's verdict. And one of the things the district court said below, and there's no basis to find that Lieutenant Trubig was an unreasonable officer, when the jury, in fact, was instructed on reasonableness as part of the excessive force claim, and they certainly found that he was unreasonable. So that's that failure to harmonize, to carry out the verdict, is what is most concerning to me. What do you think is the crux of why that particular part of it should be reversed? I can go along with rapidly evolving facts, ambiguous as to what's going to happen next, quickly tase a second time just to be sure. But the jury knew all that, came to a conclusion, and it seems to me that the district court went in a different direction. So I think that's exactly right. I think that's a very problematic aspect of the district court's opinion. It didn't cite any of this court's case law about reconciling the two as opposed to – and I think the district court, with respect, misunderstood its role here. It seemed to say, look, the jury told us that he failed to appreciate that this person wasn't resisting and that I get to decide whether that was reasonable. What I think he failed to recognize was that the jury had – and you're correct, Your Honor. The jury was specifically instructed to assess the reasonableness of the force judged from the perspective of a reasonable officer not using 20-20 hindsight. And the jury told us three things. It said – and it's interrogatories. These are the only four interrogatories geared towards the second tase. It said, one, that Defendant Trubig failed to appreciate that he was no longer resisting and that no force was needed. Two, he, in fact, was no longer resisting and no force was needed. Three, that it gave a verdict that he used unreasonable force and, in fact, reckless force sufficient to compel it to award punitive damages. Now, our position – we have no burden in this case, but our position is that 1 plus 2 may have equaled 3 here, meaning that the jury's view may well have been that a reasonable officer in these circumstances would have perceived that Mr. Jones was subdued. Now, if defendants want to come in here and say 1 plus 2 doesn't equal 3, they had to submit a question to the jury to establish that. That is our position in this case, and I see my time is up, so I'll reserve the rest for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Susan Paulson on behalf of the City of New York. Your Honors, this is far from an obvious case in which any competent officer would have known that the use of the taser to bring to an end a prolonged struggle to arrest this individual violated the Fourth Amendment. Your Honor, as Your Honor has recognized, what happened here was Officer Trubog arrived on the scene in response to a call for help. Ms. Paulson, let me just ask you to focus on the second phase, the second tase. The second tase is really the critical one. Sure. So I think there's a factual issue and a legal issue. The factual issue is the district court multiple times in the decision suggested that after the first tase, the plaintiff was rising from the floor and that that justified the second tase. And I think you will concede that that's incorrect. Your Honor, I will concede that's incorrect. But as Your Honor noted, it is uncontroverted that at the time of the second tase, he was uncuffed. And in addition to that, I would ---- Hold on. Let me just take it step by step with you. Sure. The other thing the district court did was the other facts that the district court noted about that he wasn't in a position to be cuffed, he was citing the officer's testimony, Jones's testimony. But because there was no question on this, we have to take the plaintiff's version and the facts most favorable to him, okay? Absolutely. So correct me if I'm wrong. The most favorable facts to him are he was tased through a cartridge, right, for five seconds, correct, for the first tase, yes? Yes, Your Honor. The testimony was that he was flat on the ground, on his stomach, with his arms spread, correct? Yes, Your Honor. And then tased a second time. Yes, Your Honor. After the officer reassessed the situation, correct? So my question to you is, is it the city's position that if someone is on the ground, on their stomach, having been tased, with their arms out, that it's reasonable for an officer to tase that person again? That's the question. Your Honor, if the suspect is unrestrained and unsubdued, our answer is yes. And here I would direct the Court's attention. What do you mean unsubdued? He was unrestrained, but what do you mean unsubdued? That's not the question. So, Your Honor, I get that from the plaintiff's testimony on the record on page 43, where the plaintiff was asked, were your legs immobilized? And the plaintiff said yes. Was your back immobilized? And the plaintiff said yes. But you didn't feel your muscles locking up in your arms. No, ma'am. So the plaintiff's own testimony, which is the only testimony as to whether or not Hold on a second. All that means is that he knew his arms weren't immobilized. Yes. And the There was no testimony that, well, I should say there was no testimony, but according to him, he didn't say I was moving my arms in any way. So the fact that he could feel things in his arms doesn't give an officer a justification to tase him again, right? Your Honor, what gives the officers a justification to tase him is that it's undisputed that the officers were saying, give up your arms, give up your arms, and that the appellant was saying But didn't the jury find, by special interrogatory, that he wasn't resisting? No. The jury did find that he wasn't resisting, but that doesn't mean that he was complying, Your Honor. Those are not inconsistent. They were saying According to his version of the events, he was absolutely compliant after the first  case. He didn't say I refused to give him my arms. He said my arms were outstretched and there was no testimony by anybody that they tried to cuff him after the first case, right? Your Honor, the testimony from the officers, not from the plaintiff, was that they were unable, there was testimony that they were unable to cuff him until the second until the taser was recycled. So he was being instructed Why didn't you ask the jury, why didn't you ask the jury that question? Why didn't you say to the jury, is it a fact that the officers were unable to cuff the plaintiff even after the first tase? Then we could potentially, then we could accept that, but Yes, Your Honor. We did not ask the jury that because we viewed it as one continuous event. It happened very rapidly here. He was warned that he was going to be tased. He was instructed to give up his arms. He did not give up his arms. He insisted he did not want to be arrested. He was tased and very rapidly assessing whether or not the officers could then effectuate the arrest and put his arms in handcuffs, which they were unable to do. So the jury hears all that and says, no, no, no excessive, there is excessive force, and by the way, punitive damages have been awarded because we find the mens rea is reckless or intentional. And where does the district court get the ability to say things like there is no basis to find that Lieutenant Trubig was an unreasonable officer? How can the district court kind of deviate from that? Because what the district court is looking at is whether it was objectively reasonable for the officer to believe that his conduct was lawful. It's looking to whether or not there is a mistake of law and not a mistake of fact. Not whether or not the excessive force inquiry, it was objectively reasonable to believe there was a use of force, but whether or not, you know, at least some reasonable officers would have believed that using the taser to overcome the sustained resistance in a tense situation was constitutionally permissible. And the district court properly evaluated that, looking at whether or not there was clearly established law that under these circumstances, an officer in Officer Trubig's situation would have known as an obvious case beyond debate that during this situation, the use of force was no longer. Roberts. Why doesn't SOTO stand for the proposition that if you tase someone and they no longer are fleeing or posing a risk, that you can't tase them again? Why doesn't SOTO stand for that proposition? Well, in SOTO, Your Honor, after the first taser, there was evidence that the individual was incapacitated and compliant, and there's no evidence here that the individual was incapacitated. The only evidence, although it's not clear that the officers knew, was that he wasn't incapacitated and he certainly wasn't compliant. He had not yet the officers testified that they were not yet able. I don't understand. I thought we were agreeing that we have to the facts that we have to decide this case on is that he was compliant after the first tase. His version of the events was that he was on his stomach with his arms spread. He doesn't say he was compliant. What did he say that he did that was noncompliant? He said that he was on the ground with his arms out. He did not say, I then obeyed their command to give up my arm in order to enable them to put the cuffs on. There's no evidence that they gave him a ‑‑ that he says they gave him a command after the first tase? You're saying ‑‑ It's undisputed they had been continually instructing him to give up his arms. He was tased. What happened before the first tase, you have to separate from the second tase. Whatever instruction he failed to follow after the first tase, once he's tased and he's on the ground with his arms out on his stomach, you have to assess whether the second tase at that point was on a compliant person or a noncompliant person. And I'm suggesting to you is, according to his testimony, there is no evidence that he was noncompliant after the first tase.  There's no evidence suggesting that he did give up his arms. He has been continuously instructed to do so. So inferring that he's compliant at that stage seems outside ‑‑ His testimony was that he had no opportunity to give up his arms after the first tase. He did not say he had no opportunity, Your Honor. He said my arms were spread on the ground and then I was hit with another tase. And they were not immobilized. And I was hit with another tase almost immediately. So he did not ‑‑ Your Honor ‑‑ He did not say they asked me for my arms or anything like that. It appears from ‑‑ look, we have to look at the testimony in the most favorable light to him. And I understand that there was different testimony from the officers, but those questions were not asked of the jury. Your Honor, I would argue that even looking in the ‑‑ and you are correct that we look at the testimony in the light most favorable to the plaintiff. And I would say we can't read testimony into the record that does not exist. Even reading the testimony in the light most favorable to the plaintiff, qualified immunity is proper here when at least some reasonable obvious could have believed that using a taser was necessary to overcome. There is no clearly established law either in this circuit or in another circuit that says that using it on an individual who is unrestrained and not compliant is beyond the bounds of the Fourth Amendment. But isn't there ‑‑ The case is ‑‑ Isn't there a case law for that that says if somebody is not resisting arrest, you cannot just gratuitously tase them? Your Honor, it's not as simple as that, Your Honor. The cases look at whether or not the force is gratuitous, whether or not the individual is restrained, whether or not the individual is incapacitated, and whether or not the individual is compliant. Looking at whether or not they are resisting arrest is too generalized for the qualified immunity analysis in the excessive force context. You have to look more particularly at the facts of the case. And this is ‑‑ here we know the force was not gratuitous. The jury said that he was getting up when the first taser and during the second taser, he believed that he still needed the force to effectuate it. We know that he was unrestrained. It's undisputed. And here the ‑‑ Your Honor, disputes whether or not there is evidence that he was subdued, but the only evidence in the record as to whether or not he was subdued is his own testimony that his arms were not immobilized, combined with the officer's testimony and undisputed facts that they were unable. Your position is unless he's cuffed, he's unsubdued? Is that what the argument is? Because he was unsubdued. No. Not at all, Your Honor. There are other cases in which the appellant cites in which the suspect is convulsing, in which the suspect has soiled themselves, in which there are all sorts of circumstances that show that the suspect is incapacitated. Let me just ask you. We can disagree on what the facts show or don't show. But if, in fact, the person is on their stomach with their arms out and is offering no resistance, and there are how many officers were there at the time? Five officers? There were six officers, Your Honor. Six officers. Surrounded by six officers. Your position is that you can tase ‑‑ that reasonable officers could disagree about whether you should tase that person again. Is that your ‑‑ Yes, Your Honor. In that situation? In that situation, it's reasonable where he's unrestrained, there's no evidence that he's incapacitated. You could tase him a third time then. Your Honor, the facts here don't suggest whether you could tase him a third time here. Why? It would all be the same. He's unrestrained, right? If he's unrestrained. I believe at some point it would be excessive. Here, under a quickly unfolding, he's not giving up his arms. They're unable to cuff him. They have six officers. He ‑‑ So let me just say, you say in some circumstances it would be excessive. The jury didn't find that it was gratuitous. But they did find it was excessive and they did find it was gratuitous because there were punitive damages. Well, Your Honor, I'm not sure they found it was gratuitous. They may have found it was reckless here. It's not abundantly clear how the jury arrived at that finding to support punitive damages. I don't believe the record supports that it was gratuitous where they acknowledged that he was rising up during the first taser and that he believed that he needed the second taser in order to effectuate the arrest. All right. They found it unreasonable. So, again, Your Honor, I'm not sure the basis of the punitive damage award. But, Your Honor, unlike the cases that the appellant relies on, he wasn't sitting on the counter in a fetal position with a shirt over, as like in the Brown case. He wasn't on the floor unresponsive and soiling himself. There certainly was no evidence here that he was compliant, that he was subdued. And under these circumstances, it was no reasonable officer. It's not that a reasonable officer would be compelled to conclude that his actions here violated the Fourth Amendment. Mr. Paulson, maybe you can help me. Yes, Your Honor. Judge Codall wrote a careful decision. But maybe you can just describe the timeline here. What exactly happened? And one question that you might want to bear in mind is the question that I have. How is it that Judge Codall didn't grant qualified immunity before the trial? And just describe the events at issue and what makes this reasonable in context. Sure, Your Honor. Reasonableness, as we know in this context, can mean many things. We're not talking about the reasonable man. We're talking about a range of possibilities which might be quite different, one from the other, which would be reasonable in context. So describe the setting for me, timeline, that was faced by Judge Codall before he made this decision, after all, after a jury verdict. Sure, Your Honor. Would you like me to start from the arrest or from Lieutenant Trubig's arrival? I want to know what it is that these officers were facing which prompted this action that you're seeking to defend. Sure, Your Honor. The officers encountered the suspect in the stairwell in what looked to them like a drug transaction in exchange of pills for money. They moved out into the hallway, two officers who had been doing the vertical patrol, and at that point they frisked the suspect and found drugs on him and attempted to effectuate an arrest. They put the handcuffs on the right wrist. Let me just pause for a moment, a bracket, as it were. What did they know about him, if anything, at this point? Your Honor, at that point, all that they knew was what they had observed was him in the stairwell with another individual in apparent exchange of pills for money. Is the idea or the inference that he was a drug addict himself? There's no information in the record that would suggest that they made that inference, Your Honor. Go ahead. So he gives up his right hand, is handcuffed, and then as they are trying to handcuff his left arm, he turns towards the officers. As he turns towards the officers, one of the officers sweeps his leg out from under him, and the officer and Mr. Jones fall to the ground. They are trying to get the handcuff on the other wrist. He is resisting that there's a ---- And he is resisting. He is holding his left arm. And the setting, the physical setting, again, is? They are in a narrow hallway, which is described as 5 feet wide. At this point, there are two officers present. They are now trying to get his left arm out from under his body to finish handcuffing him. And it's dark. I don't believe that there was such testimony as to the lighting. All right. Go ahead. They are unsuccessful in getting his left arm out from his body in order to complete the handcuffing. After struggling for a period of time, they call for backup assistance. The first pair of backup officers that arrive is the undercover officer and the undercover officer's partner. They continue to try. Meanwhile, Mr. Jones is saying, I won't be arrested, I won't go to jail, I don't want to go to jail, and is refusing repeated instructions to give up his arm. The second set of officers arrive. They use the baton to try to release his left arm from under his body in order to effectuate the arrest. They are unsuccessful in doing so. There is still resistance going on. There is still resistance. He is holding his, I apologize, I believe that the pepper spray, well, my adversary will correct me here as to whether the pepper spray proceeded or followed the baton. I believe it followed the baton. The officers also use the pepper spray to try to get him to release his arm. They are unsuccessful. At this point, the third set of officers, Lieutenant Trubig and his partner, arrive on the scene. At this point, he knows that this group of officers has been unsuccessful. How many officers would you say are present at this time? With Trubig and his partner, it becomes six. There were four. Six and only one of him. And one of him, he's 250 pounds. He's a large individual. He's lying on the ground. He has handcuffs. They know he's not armed. They know he's not armed. Well, Your Honor, the first set of officers who frisked him know he's not armed. There's no information in the record as to whether any of the other responding officers were informed whether or not he was armed or whether or not he had been frisked or whether or not he was suspected of a violent crime for that matter. Would you continue the response to my question about the chronology? All we know right now is that they're unsuccessful in effectuating arrest. Trubig arrives. He sees that there are four officers with a large individual in a narrow hallway who are trying to effectuate arrest and unsuccessful in doing so. He warns Mr. Jones, give up your arm. I'm going to tase you. Mr. Jones says, I don't want to go to jail or I won't go to jail or something to that effect or I don't want to be arrested. And Lieutenant Trubig tases him. At that point, the officers are still surrounding him and unable to get his arms and handcuffs. What does that mean exactly? Describe this as described to the jury. Is there still motion and resistance? There's no evidence as to that, Your Honor. There's evidence that his arms are out, but that the officers are – have not yet effectuated the arrest, have not yet gotten him in cuffs. There's no evidence that they tried to cuff him after the first tase, right? There's no – the evidence is that they didn't get him into cuffs. They say that it wasn't until the second taser. Correct, Your Honor. They do not describe an attempt to put the handcuffs on his wrist. After the second taser, then the officers are successful in moving his left arm behind him. It requires two sets of handcuffs because he's quite a large individual in order. And then he stands up and they walk him out. That is the chronology you might have to remind me of your full question. No, no. That's mostly it. So this goes to a jury. Judge Codall presides. How long did the jury – how long was this trial? Do you remember? The trial was three days, I believe. Three days. And then you have this curious verdict, right? And how would you describe this verdict? Yes, I would agree that it's a curious verdict. And there was a jury note. So there's no compensatory damages, right? There was no compensatory damages. And at first there were no nominal damages. And only when the court instructed them that in order to arrive at punitive damages, they needed nominal damages, did they concede to give 25 cents. They wouldn't even give a dollar in nominal damages. All right. So the jury also had sent a jury question asking can we send a message with our verdict. They ultimately – that question wasn't answered. Clearly here, the jury recognized that – it appears that the jury recognized that this was not a gratuitous, brutal use of force as in some of the cases. Nonetheless, the jury appears to have been uncomfortable with the use of the taser. For that reason, they awarded punitive damages. As in response to Your Honor's questions, it's not abundantly clear how they arrived at a punitive damage award in light of their finding that Lieutenant Trubick believed that the force was necessary, the second taser, in order to effectuate the rest. Go on. So what is Judge Codall's theory under the circumstances for invoking qualified immunity? Your Honor, I believe that Judge Codall's theory here is that it was not clearly established under the Fourth Amendment that it was unreasonable under these circumstances in a – under a quick succession with somebody who had been resisting arrest for a prolonged period of time, when there were a number of officers on the scene who were unable to effectuate the rest, to continue the use of force in order to bring this situation to a close. The longer these situations go on – Judge Codall's decision, or the absence of cases? Your Honor, I would say there's an absence of cases. The cases that the appellant relies on, as I said, are cases in which the force was gratuitous, in which the individual was incapacitated, in which the individual was restrained. And I would say that more recent cases from this Court, if you look at the Crowell case, if you looked at the Muschietti case, which came after the events and are not established law in – in 2018, that tasing is – if you look at Muschietti, if the law was unsettled in 2018, that – that a second taser to effectuate arrest on a 12-year-old deaf boy was not clearly unreasonable, then certainly the law was unsettled in 2013. In Muschietti, what happened, the officer tased a 12-year-old in the back because he was ignoring instructions to drop a rock. He then tased him a second time in order to get him in cuffs. And what this Court found is that reasonable officers could have disagreed as to whether two tasings were necessary to accomplish the arrest. And the same is true here. In trying to argue the contrary, if I could have one more moment. Kennedy, yes, a moment. My adversary drew recent – yesterday or the day before, I apologize, drew to this Court's attention an Eighth Circuit case in which even the three judges of the Eighth Circuit argued that using a taser was – was violated the Fourth Amendment. There, there was a dissent in that case. Plainly, none of the cases in this circuit and none of the cases in the other circuits that the appellant draws the Court's attention to demonstrate that clearly established law would have put an officer in Officer Trubrig's situation on notice, make it obvious beyond debate that the use of the second taser was – would violate the Fourth Amendment. Thank you, Your Honor. Mr. Ali has reserved some time. Thank you, Your Honor. What do you make of this curious verdict? What's your interpretation of it? So, Your Honor, here's what I would say about that. What Defendant Trubrig has stood before this Court and said is let's look at the questions the jury asked to figure out how close this case was. Let's try to, you know, pick certain facts that were good for us here and there. Let's look at what the defendants said at testimony. What this Court has said is not that we're going to relitigate the trial in the appellate court, not that we're going to try to start making assumptions about how close the jury seemed to think the case was. It said, defendants, if you have a jury verdict against you, ask the question. And what I did not hear my friends say was that they asked a question as to whether Mr. Jones was incapacitated at the time that Defendant Trubrig decided to recycle the table against him. Now, let me just make sure I'm being clear here. Let's assume that Defendant Trubrig did ask that question. Let's assume that they asked, would a reasonable jury have—sorry, would a reasonable officer in Defendant Trubrig's position have concluded that Mr. Jones was incapacitated at the time you recycled the vaults into his nervous system? Let's assume they asked that, and let's assume the jury said yes. A reasonable officer would have known that. I don't think anyone—you know, for the first time here, I guess, the defendants have said that they can tase someone who is subdued and it would not violate clearly established law. I've already discussed SOTO. I think that would make this Court an egregious outlier relative to other circuits. But let's assume they asked those questions. I think everyone would agree that it violates clearly established law. Now, so I think what that crystallizes is that the defendants are before this Court asking it to assume, one, that they asked a question that they never asked, and, two, that the jury answered it in their favor. And this Court does not do that. It does not substitute its view for a view that the jury may have had. Just really quickly to correct a couple of facts that were mentioned in the course of my friend's argument, as to whether there was a warning between the first and second tase, no officer testified that there was a warning. And, in fact, I believe Officer Muniz specifically says there was no warning. How much time was elapsed during this altercation? So, Your Honor, what we know is that the taser was used. One officer says there was a pause. Defendant Trubig himself says he had enough time to reassess the situation. And then he used it again. We're talking about five seconds? Less? More? Well, we don't know. And here's the most important point, Your Honor, is that if you think the timing between them is important, then we win this case. Because what that tells you is that Defendant Trubig had to ask that question to the jury before this Court could resolve that issue. That was something the jury went through. It was told to go to the deliberation room, and it was left with this message. This was plaintiff's counsel talking, no objection from the other side, no motion for judgment on this basis or anything like that. Consider the image of Trubig standing over Matthew Jones, face down on the ground, not posing any threat, taser prongs stuck in his back, 1,500 volts of electricity pulsating through his nervous system. That's what the jury was told to go resolve. That is what they almost certainly resolved in coming to the conclusion of excessive force and punitive damages. And anyways, the defendant certainly hasn't shown through any sort of interrogatory that that's not what its conclusion was, and it certainly hasn't shown that the jury was compelled to conclude otherwise. What about the curious verdict? No compensatory damages, 25 cents compensatory damages, I guess. So, Your Honor, I actually don't see that as curious. Do we have to worry about that? So, no, but let me just show how this is just an effort to stretch the facts in the light most favorable to Defendant Trubig. They say that's a curious verdict. But what actually happened here was the jury said, can we award punitive damages without awarding any sort of compensatory damages? Judge Codall instructed them, no, actually, you have to have at least nominal damages to do that. They went back to the deliberation room. They could have come back and said, ooh, in that case, we decided no excessive force. They didn't do that. They said, we're standing by our punitive damages award and we're assigning the nominal damages because we believe there was excessive force in that case. That's the way to read that verdict when you're looking at it in the light most  The curious part would be if they thought the second case was unjustified, unreasonable, that they would have only awarded nothing and then a quarter for the pain or the suffering of a second case. That's the curious part. Why would a jury reach that conclusion? So, Your Honor, I think this is really important. I actually hope the Court will read Mr. Jones' testimony to the jury on this. It's at JA-31 because he's asked, you know, what was this case about? And he says it wasn't about damages. This was never a case about damages. He gives it up essentially in front of the jury. This was a case about me doing what any other person could do, insisting on the basis for my arrest and going limp. And it wouldn't end with being beaten in this way, which the jury could have found, and being tased twice, including once when he was laying incapacitated, still writhing on the ground. And I think that's the crux of this case. We do think it's a narrow procedural ruling of the defendant not protecting his rights by asking the question, perhaps because he was afraid what the answer would be to the relevant interrogatory. I would say there are some special circumstances here where even though it's a narrow case, we would really urge the Court to issue a precedential opinion in this case, and the reason being that precedential opinions in the area of qualified immunity really carry special importance. And we're also dealing with a case here where the defendant is saying this is not clearly established, and all the other circuits have held it is, and it's incredibly important for this Court to recognize it, too. Thank you, Mr. Lee. Very well argued by both of you, and we're grateful to you both. We'll reserve decision. And we'll move to the second case on the day calendar, Allen against Barr. May it please the Court, Tim Hoover for Petitioner Roger Allen. Roger Allen is a United States citizen. On the undisputed and indisputable facts applying clearly issued precedential decisions from this Court, he's a citizen. Why? In 1975 and 1976, when his father obtained a New York, Kings County default divorce order and custody decree, neither his mother or Roger, who was 8 or 9 at the time, had ever been to New York. They lived in Guyana. Moreover, and this became clear in our Motion Exhibit E that the Court accepted in our reply brief, his mother was never served in New York. She was served with process in Guyana. That means two things. One, even under the, I would say, despicable 1975 and 1976 custody standards that New York had, which is the whole reason the law changed in all 50 states, there was no subject matter jurisdiction. And even under those standards at the time, even under New York law and the CPLR, someone in a divorce action where there was going to be a custody decree had to be personally served in New York. As a result of that. At a minimum, though, wouldn't we have to send it back for a hearing? Because it's not undisputed. Obviously, we did get the additional submission, which is significant, saying that she was in Guyana, but the divorce decree says she was served in New York. So shouldn't there at least be some type of hearing to see which one is correct? Three reasons why the answer is no. First of all, preliminarily, the legal standard here under 1252b-5 is the same as under Civil Rule 56. Judge Cabranes, your 1995 decision, I believe it's Fletcher v. Atex, says, look, on a Rule 56 decision, it's not some speculative fact. There needs to be a genuine issue of material fact. Second, Your Honor, the only place that the divorce decree determination that she was served in New York could come from is the court file. That's Exhibit E, pages 8 and 9. The affidavit of service, excuse me, 8 and 10. The affidavit of service at 10, and then the application for the default judgment, strangely termed an affidavit of regularity by the father's attorney at 8. And those say that she was served in Guyana. So there's no dispute of material fact. There's no dispute of fact. And moreover, the I.J. up the street here actually found at Administrative Record page 50, that's docket 13-2 on this Court's docket, that the mother and Roger were never in New York at all. So there's no issue of fact, let alone a genuine issue of material fact. It doesn't need to be transferred to the Eastern District at all. And so ultimately, and the sister was not to get the derivative citizenship, right? Sister was determined to be a U.S. citizen. And we put this in our brief because we think it's important context. The government says somehow, again, the burden at the I.J. level or the agency level's preponderance of the evidence, but my opponent has said, look, he didn't meet his burden somehow. The government itself determined for 25 years, this is Motion Exhibit A and B that the Court has before it, that the Court accepted, that Roger was a U.S. citizen. And that includes the Department of Justice, the Immigration Naturalization Service. The judge who sentenced him in the Eastern District of North Carolina even said it. And it wasn't just these random determinations of low-level persons. Back in the old INS days, the district adjudication officer was the person responsible at the local federal level for making these determinations. And so we think it's undisputed and there doesn't need to be a transfer. The bottom line is, against that set of facts, it's really an easy case. There's no disputed facts. And you apply the framework set out in Garcia that's informed him ago. Would a court, a New York court, because that's where Roger lived at the time, and by the way, one additional undisputed fact. There's no dispute. Garcia's different in ways that make this a stronger case. Garcia, there was a real issue about where he lived on the Upper West Side in 1996 when his father naturalized. Here there's no dispute because when Roger comes to the U.S. from Guyana in 1983, he comes as a green card holder. The parents' custody agreement is presented to the embassy in Georgetown. They admit him with the understanding that he's going to go live at 785 Hopkinson in Brooklyn. And there's no doubt about that. The school records, the documents, and the admission information is in the record. So you apply Garcia, and the question is a simple one. In 1983, a New York court, which would have jurisdiction over custody, would that court under Garcia follow or find the 1976 order to be enforceable? There's no doubt in our mind, at least, even under the 1976 standards, for the reason I indicated, that it wouldn't. But under the UCCJA that went into effect in 1978, it certainly wouldn't be followed. And the only thing that anyone below said about why Garcia doesn't control is, well, in Garcia, and actually in Begaud, the UCCJA was in effect at both the time of the original custody order and then the time of potential derivation. That's a distinction without a difference. The UCCJA was such a watershed, important event. And if you look at old domestic relations law 75C, excuse me, 75B, the purpose of the statute, it says the things that we've been explaining in our brief. It was designed and passed by all 50 states to address a huge problem of parental kidnapping, child snatching, contradictory jurisdictional determinations. The state law was so chaotic that the full faith and credit clause didn't even apply to custody determinations back then. So to say that the New York legislature would pass and make effective the UCCJA and specifically provide provisions at 75-D for when jurisdiction applies, 75M for when a state court, an order of this state or of another state would be years, if not decades earlier, makes no sense to us at all. Of course, in 75-Z, the legislature said this applies, this sets the standard for jurisdictional determinations. And finally, of course, the standard for derivative citizenship claims is the law at the time of derivation. So we think what ultimately might have been, when I got appointed over the summer, perhaps a close case or an interesting case has become a crystal clear case. There's no disputed facts whatsoever. And, you know, with all due respect to my opponent who's done a fine job, if the Court asks him what facts are in question, perhaps the only thing he could say, Judge, is, well, the order itself says she was served in New York. But Judge Cabran's opinion answers that in my book. We're not – the Court's not required to speculate about her potentially being served in New York that wasn't put in the court file. And, of course, that makes no sense. I'm not sure Occam's razor is a legal principle, but I think it fits pretty well here. The most likely explanation for something is the one that makes the most sense. Roger is a U.S. citizen. Thank you. Mr. Stanton? Okay. May it please the Court, there are many privileges that come with citizenship rights. Just to name a few. You can hold public office. You can vote. You can serve on jury duties. You get diplomatic protection from the U.S. government against foreign nations. For this reason, the government has a very, very strong interest in ensuring that people who claim they are citizens are, in fact, citizens. They fulfill the statutory requirements. And the case law determines that all doubts, including the U.S. Supreme Court and many, many other circuits and Judge Bianco, if you remember the Fisher opinion, all doubts regarding citizenship are resolved against the reputed citizen and the government's favor. Petitioner said the facts in this case are undisputed. Prior to his reply brief, that was certainly true, but he says a number of times in his brief that this isn't clear and that's not clear with respect to the record. All those disputes have to be resolved in the government's favor. What do you think is disputed? Disputed? Well, in his reply brief, he said it wasn't clear whether or not the mom actually received the actual divorce complaint. All she received is summons. Well, I mean, if it's not clear, then the court has to assume that she didn't, in fact, get the divorce complaint from the initiation of divorce proceedings by her soon-to-be ex-husband. And I'll address that. He also said the law was clear in 1976 that you needed not only subject matter jurisdiction but also personal jurisdiction over both parents. That's not what the academics said at the time the New York UCCJ was passed. On page 19 of our brief, we cite the editor's notes saying that child custody jurisdictions has historically been indeterminate. We also cited a law review article that says flat out a New York court could exercise jurisdiction in the custody area where it had the power to decide on matrimonial action, i.e., if one of the parties was a resident of the state, irrespective of whether the child was physically present in the state. For that proposition, the ---- Breyer. Let me give you a couple of cases. May v. May, an appellate division case, says if the defendant mother nor the child was within jurisdiction or before the court, the New York court lacked jurisdiction. Bruno v. Baric, as to the issue of custody, we find that New York should not entertain jurisdiction under the circumstances of this case since the children are presently neither domiciliaries nor residents of New York. So there are New York cases that would suggest that she was in Guyana, that this decree was invalid, right? Yes. Even assuming she was in Guyana. I mean, like the May case you're talking about, I believe that was 1932. I'm blanking on that yet. So anyway, but the section that the law review article cited was former New York domestic relations law section 240, which indicated all you needed was jurisdiction over the subject matter of the divorce. And by the way, I assume the petitioner does not dispute that the New York court had jurisdiction over the divorce because if it doesn't have jurisdiction over the divorce, the parties were, his parents were not divorced. Wouldn't it be basic that she'd have an opportunity to participate and to, if she didn't get served, if she's in Guyana, you're saying that wouldn't be problematic? That would not be problematic. Like, even assuming that, even assuming that wasn't the law of New York, I mean, she could have waived jurisdiction. So there's no dispute she did not show up. Personal jurisdiction can't be waived. She wasn't served. How could she show up? She was served the summons. There's no dispute about that. She knew this was going on. So, yes. There's no dispute that she knew it was going on? Well, she was served the summons to appear in New York to this. Let me ask you this. Why was the sister given derivative citizenship? If in fact what you're arguing to this Court is correct, there would be no basis for the sister to have gotten citizenship, right? I actually asked my director of the immigration, DOJ immigration, what I should respond to, like, if I was asked that question. His response was do not dispute the citizenship of the sister. But that being said, you cannot get citizenship by estoppel. He has to prove his own facts. And even assuming that the sister did get citizenship based on those facts, it probably was a mistake, but there's no appetite currently for the Department of Justice to challenge the sister's citizenship. The records initially said, I think, that he had citizenship, too, and then were deleted. That was a mistake, too? I'm sorry. Which one? I think, correct me if I'm wrong, that the records also indicated that he had citizenship and then in 2017. Well, I mean, people thought he would have citizenship. Various government officials thought, believed that he was a citizen, so. Based on what? That was not correct, though. Why did they believe he was a citizen? Why did they believe he was a citizen? I mean, we don't know for sure. It's possible he just told them that he was a citizen, and so. And the way derivative citizenship works, Your Honor, it's automatic. It's automatic. But if you want actual proof that you are a United States citizen, you have to actually apply. And I think that's what happened here. So if you want something that says you're an actual citizen, you have to actually apply to USCIS, and they will confirm that you are, in fact, who you say you are. In this particular case, USCIS determined, no, it doesn't cut it. I mean, again, I would like to go back to the question of personal jurisdiction over the mother. I mean, if she was served with this complaint in Guyana and did not show up, she waived personal jurisdiction. I mean, this panel has extensive trial experience. So, I mean, if you're presiding over a case and there's good subject matter jurisdiction, there's diversity, there's federal question, and the defendant or other party is elsewhere and does not appear for whatever reason, I mean, I don't think the court would dismiss the case for lack of personal jurisdiction. It would enter a judgment. And if the absent party wanted to challenge that judgment for lack of jurisdiction or whatever basis, they could do that in a post-trial motion. So back to what are the contested facts from your perspective, and what are the facts in the sister's case that were wrong? So there are the identical facts. So I assume you've gone through the sister's case. I have not, no. I've just gone through the record right here, so. So in this case, what are the disputed facts because your colleague or your opposing counsel says, you don't need to send this back. There isn't anything to resolve. We have all the records. We've provided them to this Court, and there isn't any disputed fact to resolve. Do you agree with that? Well, I mean, with respect, I mean, I would agree that there are no, there may not be disputed facts, even assuming the facts are what he says are. He still does not attain citizenship because, again, I mean, going back to the issue of personal jurisdiction with respect to the mom, why would she contest jurisdiction? I mean, I'm not a family law expert, but my understanding is when parties divorce, they argue over money and custody. Now, she's in Guyana, far away from Queens County, New York. I mean, according to the divorce decree, she left him, the mother left the husband sometime in early 1973, so she presumably wants nothing to do with him. And I assume money is not an object. She's got the kids. She's getting kids. So there was no reason for her to contest jurisdiction. Which New York case would you cite for the proposition that if the child and the mother are outside of the jurisdiction?